## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

LINDSEY HOLZHAUER,                  )
                                    )
                    Plaintiff,      )
          v.                        )        Case No. 20-cv-1037-JEH-JES
                                    )
TOWN OF NORMAL, et al.,             )
                                    )
                    Defendants.     )

### ORDER AND OPINION

This matter is now before the Court on the Amended Motion for Summary Judgment (Doc. 81) of the Town of Normal ("Normal") and Normal Police Department Defendants Richard Bleichner, Tim Edmiaston, and James Ferguson. The sole remaining Defendant, Brian Williams, is represented by different counsel and does not join in the motion. Plaintiff has filed a Response to summary judgment (Doc. 84), and Defendants have filed a Reply (Doc. 90). For the reasons set forth herein, Defendants' Motion (Doc. 81) is GRANTED in part and DENIED in part.

### I.    BACKGROUND

Plaintiff, Lindsey Holzhauer, has filed a 4-Count Complaint alleging in Count I that on November 25, 2019, Defendant Williams, not a party to this motion, confiscated and wrongly kept cash he found in her residence while responding to an emergency medical call there. When Defendant Williams learned that an investigation of the theft was underway, he allegedly called Plaintiff on November 28, 2019, identifying himself as "Jonathan." He told Plaintiff that a friend had taken the money and would return it if she would drop the investigation. During this conversation, Defendant Williams allegedly told Plaintiff that agreeing to this would be the best for herself and her children, something which Plaintiff considered a

1

threat. Defendant Williams was arrested the following day, November 29, 2019, in a sting operation undertaken by the Illinois State Police ("ISP"). Williams was criminally charged in McLean County case No. 19-CF-1206, ultimately pleading guilty to Official Misconduct, a Class 3 felony.

In Count II, Plaintiff asserts a claim under 42 U.S.C. § 1983, for a violation of her First and Fourth Amendment rights. She asserts that Normal Police Chief Bleichner, Sgt. Edmiaston, and Officer Ferguson conspired to cover-up Defendant Williams' involvement by obstructing her efforts to report the illegal seizure of her money and seek legal recourse. In Count III, Plaintiff alleges that Defendants Bleichner, Edmiaston, and Ferguson are liable to her under Illinois tort law for the intentional infliction of emotion distress ("IIED"). In Count IV, Plaintiff alleges that the Town of Normal is obligated, under 745 ILCS 10/902, to indemnify Defendants for the claims asserted against them. Plaintiff requests compensatory and punitive damages as to Counts I and II, and compensatory damages as to Count III.

## II.     PROCEDURAL HISTORY

On June 3, 2022, Defendants filed (Doc. 73), a prior "Motion for Summary Judgment" which was actually a statement of 295 Undisputed Material Facts ("UMF") and (Doc. 75, 76, 77 and 78), separate Memoranda on behalf of each Defendant. Each of the four Memoranda had an Argument section with the result that Defendants exceeded the 15-page limit provided in ILCD-LR 7.1(D)(2)(c). The various motions were stricken with leave to refile. Defendants subsequently filed an amended motion for summary judgment, with approximately 30 pages of Argument. On July 11, 2022, with leave, Plaintiff filed an oversized memorandum in response. Defendant made a similar motion which the Court allowed, with Defendants filing a 63-page Reply with numerous objections to Plaintiff's Additional Material Facts ("AMF").

Defendants' objections to Plaintiff's AMF are based, in large part, on caselaw which holds that a plaintiff does not have a constitutional right to a police investigation. Here, of course, Plaintiff does not allege merely that an investigation was not undertaken or that the investigation was inadequate. She alleges the investigation was stalled to protect Officer Williams when Defendants knew or should have known that Williams had taken the money. Plaintiff also alleges that the Defendants acted together as part of a conspiracy to intimidate her and discourage her seeking redress for the theft.

Defendants further claim that many of Plaintiff's AMF responses are based on hearsay. On many occasions, Plaintiff testified as to statements made to her by others, including the Defendants and non-defendant officers. Defendants assert these statements should not be considered at summary judgment, citing *Gunville v. Walker*, 583 F. 3d 979 (2009). This ignores that these may be admissible as the statements of an opposing party. *See* Fed. R. Civ. P. 801(d)(2) (enumerating statements of an opposing party as one of the exceptions to the rule against hearsay); *Kyles v. Krizan*, No. 17-188, 2018 WL 3824144, at *2 (W.D. Wis. Aug. 10, 2018), *aff'd,* 771 Fed. Appx. 676 (7th Cir. 2019).

In addition, it is likely that the statements of both the Defendant and non-Defendant officers would be admissible under 801(d)(2)(D) as made by agents or employees of the Defendant Town of Normal. In addition, statements made to Plaintiff by Defendants might well be admissible under 801(d)(2)(E), as allegedly "made by the party's coconspirator during and in furtherance of the conspiracy." *Id*. Furthermore, in many instances, Plaintiff does not offer the statements for a hearsay purpose. Rather, Plaintiff alleges that officers' statements regarding the investigation were false and meant to mislead her, not offering the statements for the truth of the matter asserted. As a result, Defendants' objections to Plaintiff's AMF are generally denied.

3

### III.     MATERIAL FACTS

On November 25, 2019, around 9:50 AM, Plaintiff, Lindsey Holzhauer called the Normal police to her home in response to a medical emergency. Plaintiff testified that she and her children had left the house the night before, staying at her parents' home. That night, Plaintiff spoke with her husband, Dustin Holzhauer, who threatened to take a drug overdose. On Monday, November 25, 2019, Plaintiff returned home to find all the doors locked. She gained entry after breaking a basement window and found Dustin Holzhauer in the basement, unresponsive. Plaintiff called the police and when she went upstairs, found $12,000 cash on the kitchen counter. In the police report taken several days later, Plaintiff reported that in addition to the $12,000, Dustin had given her $20,000 in cash several days prior; and Plaintiff had that money in her car. For unspecified reasons, Dustin had withdrawn all that was in their bank safety deposit box. She believes Dustin left the $12,000 on the counter to be used to pay his funeral expenses. Plaintiff placed the $12,000 on the top shelf of an upper kitchen cabinet where Dustin's medications were kept.

The Town of Normal Fire and Police Departments responded to the call. The Normal Police Officers in attendance were Officers Brock, Droege, Williams, and Sgt. Longfellow, with Williams the only Defendant in this group. Plaintiff testified that EMS responders went into the basement to stabilize and transport Dustin. While this was going on, Officer Droege asked Plaintiff to identify any medications Dustin was taking. She responded that Dustin was on Zoloft, an anti-depressant, Adderall, and a Xanax-like anti-anxiety medication. Plaintiff testified that she never gave the officers consent to search her cabinets or drawers.

Plaintiff followed the ambulance to the hospital, leaving the first responders at the scene. Dustin Holzhauer was pronounced deceased at the hospital, and Plaintiff returned to her home

around noon. When she arrived, her brother, John, and a neighbor, Larry, were attempting to remove the broken basement window. Plaintiff entered the house, checked the kitchen cabinet, and discovered the $12,000 missing. She asked her brother about the money, and he responded that he knew nothing about it and that no one had been in the house. Plaintiff thereafter retrieved the $20,000 from her car and hid it in a dresser drawer.

Plaintiff called the Normal Police Department around 12:30 p.m. and spoke with Defendant Edmiaston. Plaintiff questioned whether one of the Officers had taken the money and testified she attempted to file a report. Defendant Edmiaston testified at his deposition that he could not remember whether Plaintiff asked to file a police report at that time. (Doc. 80-9 at 80). Edmiaston advised Plaintiff that he would review the officers' body worn cameras ("BWC") and would call her the following day. Police Officer Ritter, who was sent to take Plaintiff's police report several days later, testified that he heard of the theft report that afternoon and texted the information to Defendant Williams.

The Court has reviewed the relevant BWC footage which shows Sgt. Longfellow and another Officer, presumably Brock, as Droege had followed the ambulance to the hospital, in the basement, after Dustin had been transported to the hospital. The video shows the two officers examining the scene and then going upstairs to find Defendant Williams in the kitchen. Defendant Williams had several pill bottles and a collection of pills on the countertop, trying to identify them. When asked, Williams indicated he had found the medications in an upper cabinet next to the refrigerator. Sgt. Longfellow had submitted a timeline in which he documents that Williams had been alone upstairs for three minutes. (Doc. 85-9 at 5).

Sgt. Longfellow learned of the missing money later that day and ordered the responding officers to return to the police station to dock their BWCs for review. Longfellow testified that he

5

classified the video for ease of access but did not view it. Officer Jason Wood, who served as the

Normal Police Department Communications Officer in charge of computer and cell phone

forensics, gave a deposition and testified as to the BWC access logs. He explained that any

access was recorded by the login credentials of the individual who entered the system. Wood

testified that on November 25, 2019, at 1:07 PM Sergeant Longfellow's credentials were used to

activate the BWC viewer and to assign a file number to the footage. (Doc. 80-20 at 53). The log

shows someone with Defendant Edmiaston's credentials accessing the viewer at 2:18 PM on

November 25, 2019, and Defendant Williams' credentials accessing at 1:01 PM. (Doc. 80-21 at

5-8). Wood testified that Defendant Edmiaston's credentials were used to access the viewer

again, on November 27, 2019, at 8:25 AM and several times thereafter.

Plaintiff did not hear from Sgt. Edmiaston on Tuesday, November 26, 2019, despite his

assurances that he would call her after reviewing the BWC footage. Plaintiff called a cousin,

Brian McCabe, a retired Livingston County Sheriff's deputy. Mr. McCabe recommended that

Plaintiff have an agency other than the Normal Police Department investigate the theft.

On Wednesday, November 27, 2019, Plaintiff called and spoke with Defendant

Edmiaston. Defendant Edmiaston reported to her, and testified at his deposition, that he had

viewed the BWC of the responding officers and there was no evidence of theft. (Doc. 80-9 at

85). While Plaintiff claims that Edmiaston had not reviewed the video prior to this conversation,

as noted, the logs document that Edmiaston's credentials had been used to access the BWC two

days prior, on November 25, 2019. (Doc. 80-21 at 7). At some point, Edmiaston noted that

Williams's camera had been temporarily turned off and did not show him opening the cabinets. It

is unclear whether he discovered this on Monday, the 25th, or Wednesday, the 27th. On

Wednesday, November 27, 2019, Edmiaston asked Officer Longfellow about Williams having

accessed the kitchen cabinet. Longfellow texted Williams, asking whether he had done so. Williams responded that he had opened the cabinets and drawers but had not searched them.

It does not appear that Defendant Edmiaston disclosed to Plaintiff any suspicions he might have had about Defendant Williams during this conversation on November 27, 2019. Plaintiff reiterated that the only people present when the money went missing were first responders. She also told Edmiaston that her husband had home security cameras and she would try to access the footage. At that point, Defendant Edmiaston sent Officer Ritter to the home to take a report. Plaintiffs asserts that this was only done because she had footage which could have potentially incriminated an officer.

Officer Ritter has testified that he objected to being sent to take the statement as he was aware there was a potential issue of officer misconduct. It was his opinion that the report should have been taken by a supervisor or someone in the investigation unit. Nonetheless, Ritter arrived at the residence about 8:30 AM and spoke with Plaintiff. Ritter testified that when he later asked Edmiaston whether he should list the responding police officers as suspects, he was told "no." (Doc. 87-3 at 27). Edmiaston disputes this, testifying that he did not tell Ritter to exclude police officers as potential suspects. (Doc. 81-8 at 98).

Ritter also testified that Edmiaston told him to list Dustin Holzhauer's brothers as suspects. (Doc. 81-6 at 27). Ritter did so, listing John and Jeremy Holzhauer as the only suspects. (Doc. 85-2 at 38). Plaintiff claims she told Ritter that Dustin's brothers were not there, as only emergency responders were at the scene. Plaintiff did tell Ritter, and later testified in her deposition to an incident later that day, involving Dustin's brother, John Holzhauer. Plaintiff testified that she had taken the $20,000 from her car and hidden in a drawer some time after returning from the hospital. John Holzhauer came to the house later that day, and Plaintiff found

him wandering about the house, going into her closet, and behaving strangely. When Plaintiff went to the drawer for the $20,000, it was gone. She called John's Mother who spoke with John. He returned the money to Plaintiff that day, claiming that he had found it in a drawer and that she had merely overlooked it. (Doc. 85-3 at 26).

Defendant Edmiaston was questioned at his deposition regarding Ritter's testimony that he was not to list the responding officers as suspects. Edmiaston asserted that Ritter was not being truthful in this, and that on one prior occasion, he had believed Ritter was "not fully honest" with him. Edmiaston testified vaguely that an informal investigation into the not particularly described matter did not reveal wrongdoing or, at least, end in Ritter being disciplined. When asked why, after this incident, he had recommended that Ritter be promoted to CSO, Edmiaston professed to not remembering having done so. (Doc. 85-1 at 9-10). He also testified that, while, he had made a record of Defendant Williams having temporarily turned off his BWC but could not remember where or when he had documented it. (Doc. 85-1 at 12).

Later that same day, Defendant Edmiaston sent Officers Rippy and Underwood to Plaintiff's home to obtain the home surveillance video. Plaintiff asserts that Defendant Edmiaston's reason for doing so was to confiscate any footage which might implicate an officer. Plaintiff gave the Officers the password so they could access the system. Rippy noted that the videos showed an "offline" prompt, leading him to believe that the cameras were not hooked up or were not operating properly. Rippy asked whether the video could have been stored on a hard drive or laptop, asking that Plaintiff hand over these items. She refused to do so, and the officers left. That same day, Edmiaston filed a citizen's complaint of the events, back-dating it to November 25th, his first contact with Plaintiff. He had no further interaction with her.

At some point on Wednesday, November 27, 2019, Assistant Chief Stephen Petrilli

informed Defendant Bleichner that first responders may have been involved in the theft and that a report had been taken. Defendant Bleichner also learned that an officer had turned off his body camera during the event.

On Thursday, November 28, 2019, Thanksgiving Day, Plaintiff checked her phone and saw that the evening before, she had missed four or five calls from a number she did not recognize. (Doc. 85-3 at 35). At approximately 11:00 a.m., Plaintiff received a call from an individual who identified himself as "Jonathan." Jonathan claimed that a friend had taken the money and that he would return it if Plaintiff abandoned the investigation. Jonathan mentioned that the return of the money would help Plaintiff's minor children, something which Plaintiff viewed as a threat. Fearing for her children's safety, Plaintiff collected them and left the house.

That same day, Plaintiff's brother, Adam Deal, contacted Tim Price of the Illinois State Police ("ISP"). Price learned that the ISP would not be able to initiate an investigation until Monday and called Officer Rippy of the Normal Police to advise him of the report to the ISP. Rippy reported this to Sgt. Cherry who, in turn, reported it to Defendant Bleichner. Defendant Bleichner asked Cherry to arrange a meeting between Plaintiff, Bleichner, Cherry, and Officer Ferguson who was head of the Vice Unit. Cherry did so, calling Plaintiff late that evening.

The following day, Friday, November 29, 2019, Plaintiff met with Cherry, Bleichner and Ferguson, with McCabe in attendance. At the meeting, Defendant Bleichner questioned whether the thief might have been a family member, reportedly asking Plaintiff if she would be willing to accept that, if true. Plaintiff became upset and cursed, telling Bleichner that when she followed the ambulance to the hospital, the only people in the house were the first responders. Chief Bleichner testified that when he made the comment, it was not clear to him that first responders were the only ones at the scene. (Doc. 81-10 at 112).

McCabe also testified about the meeting. He stated that Defendants Bleichner and Ferguson appeared upset about the ISP being involved and were "almost insistent" that Plaintiff put off meeting with Jonathan until they had furthered their investigation. (Doc. 85-8 at 7-8). McCabe testified that he confronted Defendant Bleichner afterward, stating that Bleichner and the others knew who had taken the money and should "do the right thing" by Plaintiff. *Id.*

After the Friday, November 29, 2019 meeting, Defendant Bleichner determined that an outside investigation should be undertaken and contacted the ISP. Later that afternoon, Sgt. Cherry and Officer Ferguson met with several ISP officers. The ISP set up a sting operation that same day whereby Plaintiff would meet Jonathan at a gas station in Pontiac. Defendant Williams showed up at the appointed time and gave Plaintiff $13,000 dollars in a plastic bag. He was arrested as he pulled away. On November 20, 2020, Williams pled guilty to Official Misconduct, a Class 3 Felony, resulting in a fine and 30 days imprisonment. (Doc. 80-5 at 2).

Plaintiff was later interviewed by the ISP and initially reported that Ritter was kind to her, and that Cherry and Ferguson were "super cool." She testified at her deposition that after reflection, she believes that Ritter had "an agenda" and that Ferguson had been "very manipulative." (Doc 85-3 at 42-43). She had fewer good things to say about Defendant Edmiaston. Plaintiff has provided affidavit testimony that she felt intimidated during the Friday meeting with Bleichner, Cherry and Ferguson, and would not have made any further efforts to reach out to the ISP. (Doc. 85-19).

## IV.     SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant if entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). When presented with a

motion for summary judgment, the Court must construe the record "in the light most favorable to the nonmovant and avoid[] the temptation to decide which party's version of the facts is more likely true." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). The moving party has the burden of providing proper documentary evidence to show the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323-24. Once a properly supported motion for summary judgment is filed, the burden shifts to the non-moving party to demonstrate with specific evidence that a triable issue of fact remains for trial. *Gracia v. Volvo Europa Truck, N.V.*, 112 F.3d 291, 294 (7th Cir. 1997). The party opposing summary judgment "must present definite, competent evidence in rebuttal." *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004).

Accordingly, the non-movant cannot rest on the pleadings alone, but must designate specific facts in affidavits, depositions, answers to interrogatories or admissions that establish that there is a genuine triable issue; he "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Finally, a scintilla of evidence in support of the non-movant's position is not sufficient to oppose successfully a summary judgment motion; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## V.   DISCUSSION

### A.  CONSPIRACY

In Count II, Plaintiff asserts a claim under 42 U.S.C. § 1983, alleging that Defendants Bleichner, Edmiaston, and Ferguson conspired with one another to violate her First and Fourth

Amendment Rights. Plaintiff asserts a Fourth Amendment violation in that Defendants covered-up the illegal seizure of her property and a First Amendment violation in that Defendants compromised her efforts to seek legal redress. *Hartman v. Moore*, 547 U.S. 250, 256 (2006); *Rossi v. City of Chicago*, 790 F.3d 729, 734 (7th Cir. 2015) ("Interference with the right of court access by state agents who intentionally conceal the true facts about a crime may be actionable as a deprivation of constitutional rights under § 1983.") (internal citation omitted).

As Defendants note, a claim for conspiracy to violate a Constitutional right may only proceed if there has been an underlying constitutional violation. *Kunz v. City of Chicago*, 234 F. Supp. 2d 820, 825 (N.D. Ill. 2002). To proceed on a conspiracy claim, Plaintiff must establish that: (1) two or more defendants reached an agreement or meeting of the minds to violate her constitutional rights, and (2) Defendants participated in an overt act which caused the Constitutional violation and did so in furtherance of the conspiracy. *Reynolds v. Jamison*, 488 F.3d 756, 764 (7th Cir. 2007). Defendants deny both that Plaintiff suffered a constitutional injury and that they participated in a conspiracy.

Defendants note that in *Rossi*, the Seventh Circuit found the Constitution does not provide a protected right to a police investigation. There, Plaintiff alleged that he had been assaulted by several individuals, including an off-duty police officer. Plaintiff brought an action against the investigating detective, alleging that the detective violated his First and Fourteenth Amendment rights to judicial access when he concealed the assailant officer's identity and failed to investigate the crime scene.

In *Rossi*, the Appellate Court referenced the Supreme Court's decision in *DeShaney v. Winnebago County Department of Social Services,* 489 U.S. 189, 196 (1989) finding there was no Constitution right to governmental aid, "even where such aid may be necessary to secure life,

liberty, or property interests of which the government itself may not deprive the individual." The Court held that "mere inactivity by police does not give rise to a constitutional claim," framing the issue as not whether plaintiff's case suffered due to an inadequate investigation, but whether the lack of police cooperation amounted to a denial of judicial access. *Id*. at 735. It found that as the police misbehavior did not prevent plaintiff timely filing a claim against the assailants, his rights to access were not infringed. This was so, even though plaintiff's case would likely have been "stronger" with a more robust investigation. *Id*. at 736.

Plaintiff's claims against Defendant Bleichner are that Defendant impeded her efforts to seek legal redress by delaying referral to the ISP, and counseling Plaintiff to let the Normal Police handle the matter. Plaintiff also claims that Bleichner attempted to obfuscate the investigation by suggesting that it was family members who were to blame. Here, however, it is clear that after meeting with Plaintiff, Defendant Bleichner referred the matter to the ISP, this within two days of learning of possible police involvement, and within four days of the theft. Plaintiff offers nothing to support that any alleged delay impeded her rights to access by prejudicing the criminal proceedings against Defendant Williams.

Plaintiff alleges that Defendant Edmiaston, too, violated her rights to seek legal redress. She asserts that, despite her request, Defendant Edmiaston did not take a police report on November 25, 2019, only directing Officer Ritter to do so two days later. She also asserts that Defendant Edmiaston was untruthful when he told her he had viewed the officers' BWCs prior to his conversation with her on November 27, 2019. As noted, however, Edmiston asserts otherwise and there is evidence in the video logs which suggests that he had viewed the footage on November 25, 2019. Lastly, Plaintiff asserts that Edmiaston impeded the investigation by directing Ritter to omit the responding officers as potential suspects and did not inform her when

13

it should have been clear to him that Williams took the money. Here again, however, Plaintiff fails to establish that any action or inaction on Defendant Edmiaston's part prejudiced any claim she might have against Williams.

Plaintiff alleges against Defendant Ferguson that at the November 29, 2019 meeting, he sought to intimidate her against moving for an ISP investigation, and that she, in fact, resolved not to do. Shortly after the meeting, however, Defendant Bleichner agreed to involve the ISP and Williams was apprehended that same day. As a result, Plaintiff suffered no appreciable prejudice to her rights to legal redress as a result of the alleged intimidation by Ferguson.

In short, Plaintiff offers no evidence that the actions of Bleichner, Edmiaston, or Ferguson impeded her right to legal access. Plaintiff first contacted the Normal Police Department on Monday, November 25, 2019, and on Friday, November 29, 2019, Defendant Bleichner made the decision to turn the matter over to the ISP with the result that Defendant Williams was apprehended that day. It might be that Plaintiff and her brother forced Defendants' hand when they preemptively contacted the ISP, and if they had not done so, the outcome would have been different. That is not the case before the Court, however, and there is nothing to suggest that a few days' delay in arresting Williams prejudiced Plaintiff's access to the courts. As Plaintiff has failed to establish that the actions of Bleichner, Edmiaston, and Ferguson caused a violation of her constitutional rights, she cannot proceed on a claim that Defendants conspired together to violate her constitutional rights. *See Kunz*, 234 F. Supp. 2d at 825 (finding that § 1983 does not create an independent action for the conspiracy itself, but allows recovery only where the conspiracy caused the violation of a clearly established constitutional right).

B.  IIED CLAIM

In Count III, Plaintiff alleges a state law claim against Defendants Bleichner, Edmiaston, and Ferguson for the intentional infliction of emotion distress ("IIED"). In support, Plaintiff asserts that her husband had just died, she returned home to find $12,000 missing, and Defendants attempted a cover-up by blaming Plaintiff's family members. She also claims, generally, that "Defendants" gave Williams notice of Plaintiff's complaint, so as to tip him off, precipitating Williams contacting her and threatening her children.

"Under Illinois law, a plaintiff claiming intentional infliction of emotional distress must demonstrate that the defendant intentionally or recklessly engaged in 'extreme and outrageous conduct' that resulted in severe emotional distress." *Dent v. Nally*, No. 16-00442, 2016 WL 2865998, at *4 (S.D. Ill. May 17, 2016) (internal citations omitted). IIED requires more than mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. *Boston v. U.S. Steel Corp.,* 816 F.3d 455, 467 (7th Cir. 2016). "[E]motional distress alone is not sufficient to give rise to a cause of action. The emotional distress must be severe." *Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1030 (7th Cir. 2006) (internal citations omitted). "Fright, horror, grief, shame, humiliation, worry, etc. may fall within the ambit of the term 'emotional distress,' these mental conditions alone are not actionable." *Id*. at 1030. The emotional distress must be "so severe that no reasonable man could be expected to endure it. The intensity and duration of the distress are factors to be considered in determining its severity." *McGrath v. Fahey*, 126 Ill. 2d 78, 86 (1988).

To determine whether conduct is extreme and outrageous, the Court is to consider: 1) the degree of power or control Defendants had over plaintiff; 2) whether Defendants reasonably believed they had a legitimate objective; and 3) whether Defendants were aware that Plaintiff

15

was "peculiarly susceptible to emotional distress, by reason of some physical or mental peculiarity." *Hardy v. Hardy*, No. 10-5921, 2013 WL 5325077, at *5 (N.D. Ill. Sept. 20, 2013) (citing *Franciski v. Univ. of Chi. Hosp.,* 338 F.3d 765, 769 (7th Cir. 2003)).

Plaintiff cites *Cairel v. Alderden*, 821 F.3d 823 (7th Cir. 2016) to support that as police officers, Defendants were in a position of power over Plaintiff; and due to her husband's death, Plaintiff was particularly susceptible to suffering severe emotional distress. The Court notes that the plaintiff in *Cairel* was an arrestee with a learning disability who falsely confessed to robbery during police interrogation. The court in that case noted the inherent power imbalance between the parties but determined that this would not pose a problem unless defendants' actions "were far out of bounds for an interrogation of a lawfully arrested suspect." *Id*. at 836. The court dismissed plaintiff's IIED claim at summary judgment, finding that defendants had a legitimate law enforcement objective and that "defendants were entitled to try to solve the crimes by investigating and interrogating the plaintiffs." *Id*. at 836.

Here, Plaintiff was neither arrested nor interrogated, being in the position of a complaining witness. Plaintiff was free to go about as she pleased, without fear of imprisonment. While Plaintiff claims to be intimidated at the time of the November 29, 2019 meeting with Defendants Bleichner and Ferguson, and Sgt. Cherry, Plaintiff had present an ally in retired officer McCabe. Alleged power imbalances have not been recognized in far more restrictive environments. *See Hardy*, 2013 WL 5325077, at *7 (finding in a prison setting, the defendant doctor did not have the "physical authority" or "complete control" over the prisoner plaintiff so as to satisfy the first element of an IIED claim). As to Defendant Edmiaston, Plaintiff does not identify facts to support a power imbalance between herself and Edmiaston during their several telephone calls.

16

Plaintiff also fails to establish the second and third elements; that Defendants' conduct was extreme or outrageous; or they could not reasonably have believed they had a legitimate objective. Plaintiff bases her IIED claim against Defendant Bleichner, in part, on Bleichner's suggestion at the Friday, November 29, 2019 meeting, that one of Plaintiff's family members might have taken the money. Defendant has testified, however, that prior to the meeting, he read Defendant Ritter's report, which identified only the two Holzhauer brothers as potential suspects. However, as Assistant Chief Petrilli testified, Bleichner was on notice at this time that one of the responding officers had turned off his BWC, and likely already suspected Williams. Still, as noted in *Cairel*, Bleichner was "entitled" to further investigate the matter and apparently did so by speaking directly with Plaintiff. *See id*. 821 F.3d at 836. Here, there is no evidence to support that Bleichner's actions were outrageous, knowing Plaintiff was particularly susceptible to emotional distress. In addition, the evidence is not sufficient evidence to establish that Bleichner could not have reasonably believed his actions were in furtherance of a legitimate law enforcement objective.

Plaintiff also asserts that at the November 29th meeting, Bleichner encouraged her to put off meeting with Jonathan while the Normal Police investigated further. Plaintiff asserts that she was in fear of Jonathan who had threatened her children, and that any suggested delay was extreme, outrageous, and certain to cause her severe emotional distress. Plaintiff ignores that the alternative she sought, a clandestine meeting with Jonathan in a parking lot, was also likely to cause her emotional distress. The fact remains that Bleichner changed his mind after meeting with Plaintiff and reached out to the ISP which apprehended Williams that same day. While Plaintiff argues that Bleichner unreasonably delayed this decision, the Court cannot find that a

delay of several days while the Normal Police investigated the matter was outrageous and done with the intent or reasonable belief that this would result in severe emotional distress to Plaintiff.

As to Defendant Edmiaston, the Court credits Plaintiff's statement, as it must, that she wished to file a police report at the time of her initial conversation with Defendant. Still, the Court cannot find that a two day delay between this conversation, and Defendant Edmiaston sending Ritter out to take the report, would be likely to cause severe emotional distress. While Plaintiff had several telephone conversations with Defendant Edmiaston and suspects he was trying to cover-up for Williams, she does not identify any extreme reaction she had as a result of these conversations.

Plaintiff's claim of extreme and outrageous conduct by Defendant Ferguson, is even thinner. Plaintiff bases this solely on Ferguson's alleged efforts on November 29, 2019, to intimidate her and manipulate her into withdrawing any request for an ISP investigation. It is uncontroverted that Ferguson only learned of the theft the day before. On the following day, he met with Plaintiff and coordinated efforts with the ISP, which resulted in Defendant Williams's arrest. There is nothing here to support that this conduct reached the level necessary for IIED.

Plaintiff makes the general claim that Defendants Bleichner, Edmiaston, and Ferguson's "improper handling of her theft complaint" caused this information to be leaked to Defendant Williams. Plaintiff asserts that this caused Williams to contact her, intimidate her, and precipitate her leaving her home in fear. Plaintiff asserts, without support, that this "would not have happened but for the Defendants' wholly inappropriate handling of Plaintiff's theft report." (Doc. 84 at 52). Plaintiff has not offered evidence, however, that Defendants Bleichner, Edmiaston or Ferguson "leaked" information to Williams. While Sgt. Longfellow and Officer Ritter have

admitted to speaking with Defendant Williams about Plaintiff's theft allegations, neither is named a Defendant.

In addition, Plaintiff does not address that to properly investigate the allegations, Williams had to be directed to download his BWC, and to be questioned by Longfellow about his search of the kitchen. This alone would likely have placed Williams on notice that the theft was being investigated. Plaintiff offers no evidence that Bleichner, Edmiaston or Ferguson leaked information to Williams, and it is clear that they did not leak information as to the ISP sting operation as Williams showed up, unaware.

Plaintiff makes much of the Court's Order on Defendants' Motion to Dismiss, where it found that Plaintiff had pled enough to proceed on an IIED claim as "[t]he various abuses of power by the Defendants to conceal the crime and protect the individual police officer and Normal Police Department while threatening the safety of Plaintiff's minor children constitute extreme and outrageous conduct." (Doc. 21 at 9-10). The standard applied at summary judgment is higher, however, than that applied to a Rule 12(b)(6) motion to dismiss. Plaintiff's allegations that she was treated with disrespect and intimidation do not rise to the level of outrageous conduct which no reasonable person could be expected to endure. *McGrath*, 126 Ill. 2d at 86. The same applies to Plaintiff's complaint that family members were suggested as suspects, this, particularly, as Plaintiff's brother and a neighbor were on the premises, albeit outside the house, when she returned from the hospital.

The most compelling of Plaintiff's claims is that Williams was tipped off, leading him to contact and threaten her. As the Court has noted, however, the matter could not have been investigated without some notice to Williams and there is no evidence that any of the named

19

Defendants tipped him off. While Williams's conduct might well reach the level necessary for IIED, the same cannot be said of Defendants Bleichner, Edmiaston and Ferguson.

Plaintiff has failed to sufficiently rebut Defendants' evidence and establish that Bleichner, Edmiaston and Ferguson acted in an outrageous manner with the intent to cause her severe emotional distress, without a reasonable belief that they were pursuing a legitimate law enforcement objective. *See Gracia*, 112 F.3d at 294 (when the movant properly supports a motion for summary judgment, the burden shifts to the other to identify specific evidence that there remains a triable issue of fact).

### C.  QUALIFIED IMMUNITY

Defendants Bleichner, Edmiaston and Ferguson assert the affirmative defense of qualified immunity; that their conduct did not violate a clearly-established constitutional or statutory right of which they should reasonably have been aware. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Here, however, the Court has found that these Defendants are not liable to Plaintiff, so the Court need not address the qualified immunity defense. *Van den Bosch v. Raemisch*, 658 F.3d 778, 787 n. 9 (7th Cir. 2011).

### D.  THE TOWN OF NORMAL'S DUTY TO INDEMNIFY

In Count IV, Plaintiff asserts that under the Illinois Local Governmental and Governmental Employees Tort Immunity Act, 745 ILCS 10/9-102, Normal is obligated to indemnify Defendants for their employment-related actions. The Act provides, in pertinent part, that an employer is required "to pay any tort judgment or settlement for compensatory damages" for which an employee becomes liable "while acting within the scope of his employment . . ." For such a claim to succeed, Defendants must have been acting within the scope of their

employment when they injured Plaintiff. *See Copeland v. County of Macon*, 403 F.3d 929, 932 (7th Cir. 2005) (citing *Pyne v. Witmer*, 129 Ill. 2d 351, 359 (1989)).

The Court need not consider the indemnification issue as to Defendants Bleichner, Edmiaston, and Ferguson as it finds in their favor on summary judgment, so there remains no liability to be indemnified. "An indemnification claim necessarily will be tied to an underlying claim for liability." *Baskins v. Gilmore*, No. 17-07566, 2018 WL 4699847, at *12 (N.D. Ill. Sept. 30, 2018) (finding that where plaintiff failed to state a claim against the employees, "there was no wrongdoing to indemnify.").

As Defendant Williams remains a party, the Court must consider whether Normal has a duty to indemnify him. Normal asserts that Williams's actions were so wrong as to take him outside the scope of his employment, obviating any duty to indemnify. *Bagent v. Blessing Care Corp.*, 224 Ill. 2d 154, 164 (2007) (an employee's act is not within the scope of employment if it is not of the kind he was ordinarily employed to perform). Plaintiff counters, citing caselaw to support that Normal has a duty to defend despite Williams's illegal activity. *See Hibma v. Odegaard*, 769 F.2d 1147, 1153 (7th Cir. 1985) (finding an employer liable if defendant, while pursuing his own objectives, simultaneously furthers the objectives of the employer). Defendant Williams, who is represented by separate counsel, has not made a response.

Although there is no response from Williams, the Court will deny Defendants' motion regarding the indemnification of Williams as it is not ripe for review. "Ripeness 'is a doctrine of justiciability invoked to determine whether a dispute has matured to a point that warrants decision.'" *Medline Indus., Inc. v. Ram Med., Inc.*, 892 F. Supp. 2d 957, 963 (N.D. Ill. 2012) (internal citations omitted). "Inquiries into ripeness generally address two factors: first, whether the relevant issues are sufficiently focused so as to permit judicial resolution without further

factual development; and, second, whether the parties would suffer any hardship by the postponement of judicial action." *Id*. (citing *Triple G Landfills, Inc. v. Bd. of Commis. of Fountain Cnty., Ind.*, 977 F.2d 287, 288–89 (7th Cir. 1992).

"[A[n indemnification claim is not ripe (unless and) until liability has been established." *Humphrey v. City of Anderson*, No. 19-00764, 2020 WL 3060363, at *12 (S.D. Ind. June 8, 2020) (citing *Nationwide Ins. v. Zavalis*, 52 F.3d 689, 693 (7th Cir. 1995); *McFerson v. Gilden*, No. 16-186, 2020 WL 7642352, at *4 (N.D. Ind. Dec. 23, 2020) (denying summary judgment challenge to indemnification and dismissing without prejudice "[b]ecause [Defendant's] liability has yet not been determined."). Where there is a dispute as to whether an employee was acting within the scope of employment, the issue should typically "await resolution at trial." *Baskins*, 2018 WL 4699847, at *10 (N.D. Ill. Sept. 30, 2018) (declining to consider indemnification at the motion to dismiss stage). *Doe v. City of Chi.*, 360 F.3d 667, 672 (7th Cir. 2004) (reversing trial court's disposition of indemnity issue at summary judgment) ("The district judge jumped the gun when she entered a final, appealable judgment on Doe's claim against the City. We have warned repeatedly against trying to resolve indemnity before liability.").

As there has been no finding as to Defendant Williams' liability, any decision as to Defendant Normal's duty to indemnify him is premature and is denied. This denial is without prejudice to Defendants reasserting at a later date.

## VI.    CONCLUSION

For the reasons stated above, the Court hereby makes the following findings:

1.    The Court GRANTS Defendants' Motion for Summary Judgment (Doc. 81) in part and DENIES in part. The Court grants summary judgment to Defendants Bleichner,

Edmiaston and Ferguson and they are dismissed as parties. The Clerk is to amend the docket to reflect this.

2.      The Court denies summary judgment to the extent the Town of Normal seeks a ruling on its obligation to indemnify the only remaining Defendant, Brian Williams. The Court finds this issue premature as it is not ripe for review. This denial is without prejudice to Defendant reasserting at a later time.

3.      This case will proceed as to Defendant Williams only.


ENTERED this 3rd day of January, 2023.


                              s/James E. Shadid
                         JAMES E. SHADID
                         UNITED STATES DISTRICT JUDGE